538 F.2d 431
 176 U.S.App.D.C. 83
 Barbara H. HOOKS, Individually and as the Administratrix of
the Estate of Charles E. Hooks, Deceased
v.
SOUTHEAST CONSTRUCTION CORPORATION, a Corporation, Appellant,
v.
ANTHONY IZZO COMPANY, INC., Third-party Defendant.
 No. 75-1872.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 16, 1976.
Decided June 28, 1976.
As Amended on Denial of Rehearing Aug. 25, 1976.
 
 David M. Moore, Washington, D. C., for appellant; John J. O'Neill, Jr., Washington, D. C., on brief.
 Michael T. O'Bryant, Silver Spring, Md., with whom Leonard L. Lipshultz, Silver Spring, Md., was on the brief, for appellee Anthony Izzo Co.
 Richard W. Boone, Washington, D. C., for appellee Nathaniel Ford, Inc.
 Before MacKINNON and ROBB, Circuit Judges, and WEIGEL,* United States District Judge for the Northern District of California.
 Opinion for the court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 Southeast Construction Corp. (Southeast) is a general contractor which entered into a contract with Anthony Izzo Co. (hereafter Izzo and Subcontractor), a masonry subcontractor, to perform certain masonry work as part of a construction project. Izzo in turn subcontracted with the Nathaniel Ford Brick Cleaning Company for the pointing and cleaning of the masonry. In performing the work of the subcontractor, the plaintiff's decedent Hooks lost his life through the alleged negligence of Southeast. Southeast settled plaintiff's suit for $57,000 and here under the terms of the contract seeks to recover from Izzo on the subcontractor's contractual obligation to carry public liability insurance protecting Southeast.
 
 
 2
 The only issue in this appeal is whether the district court correctly interpreted section 7 of the contract between appellant Southeast and appellee Izzo. Section 7 of the contract reads:
 
 
 3
 Sub-contractor (Izzo) agrees to carry Public Liability Insurance protecting Sub-contractor and Contractor (Southeast) and Workmen's Compensation Insurance in connection with employees engaged in the performance of this agreement with company and in an amount satisfactory to Contractor. Sub-contractor agrees to indemnify Contractor from claims growing out of injury received or damage done by reason of any act, omission, or negligence of Sub-Contractor (sic). Sub-contractor shall supply Contractor with certificates for Workmen's Compensation Insurance and Public Liability Insurance before commencing work under this agreement.
 
 
 4
 (J.App. 53). Izzo argues that the first two sentences must be read together as though the second qualified the first. Under such interpretation subcontractor Izzo concludes he only agreed to provide public liability insurance for injuries received or damage done "by reason of any act, omission, or negligence of Subcontractor (Izzo) " (emphasis added), and thus was not required to provide insurance against the injuries in this case which were allegedly caused by the negligence of Southeast. This argument was accepted by the district court, which dismissed the third party complaint of Southeast against Izzo. We disagree.
 
 
 5
 On this appeal, Southeast argues that the correct reading of section 7 indicates that Izzo agreed to two separate obligations. By the first sentence Izzo was required "to carry public liability insurance protecting Sub-Contractor (Izzo) and Contractor (Southeast)." By the second sentence Izzo undertook to indemnify Southeast against liability growing out of Izzo's "act, omission, or negligence." After careful study of the relevant contract and insurance law, we agree with the interpretation of section 7 advanced by Southeast.
 
 
 6
 In order to accept Izzo's argument, one would first be required to find, inter alia, that the two concepts of liability insurance and indemnity are one and the same. However, they are not. A leading treatise points out a significant distinction between liability policies and policies (contracts) of indemnification:
 
 
 7
 Indemnity and liability insurance distinguished.
 
 
 8
 Under a liability policy the insurer is required to make payment although the insured has not yet suffered any loss, for by definition the purpose of the liability policy is to shield the insured from being required to make any payment on the claim for which he is liable.
 
 
 9
 Under an indemnity contract, by way of contrast, the insurer (contracting party) is only required to indemnify or make whole the insured (indemnitee) after he has sustained actual loss, meaning after the insured (indemnitee) has paid or been compelled to make a payment, his action against the insurer (indemnitor) then being to recover the amount of such loss by way of indemnity. Thus in substance the distinction between an indemnity and a liability policy is that payment by the insured (indemnitee) is necessary under the indemnity but not under the liability contract.
 
 
 10
 11 Couch on Insurance § 44:4 (R. Anderson 2d ed. 1963) (matter in brackets supplied, footnote eliminated).[1] See also id. at § 44:249. The distinction is in the insurer's obligation to defend or protect the interest of the insured, as opposed to the indemnitor's duty to reimburse the indemnitee for a loss he has sustained and paid. Haun v. Guaranty Security Insurance Co., 61 Tenn.App. 137, 453 S.W.2d 84 (1969). Thus, the first two sentences of section 7 must logically be read as requiring different undertakings by Izzo. They are different in nature and different in scope. The first sentence, dealing with public liability insurance, pledges Izzo to provide insurance protecting Southeast against liability for damage to personal property or for personal injuries to nonemployees of Southeast, i. e., the public. See 1 Couch, supra at § 1:88[2]; 11 Couch, supra at § 44:246. The second sentence commits Izzo to indemnify Southeast for all claims that Southeast may have been required to pay as a result of "any act, omission, or negligence" of Izzo. Among other risks, this provision provides limited protection for Southeast against the insolvency of the public liability insurance carrier, i. e., to the limited extent that Southeast may not be able to recover from its public liability insurer for damages it may pay on account of any act, omission or negligence of Izzo. See, e. g., Herchelroth v. Mahar, 36 Wis.2d 140, 153 N.W.2d 6 (1967).
 
 
 11
 The first two sentences of section 7 therefore deal, respectively, with the obligations to furnish public liability insurance and workmen's compensation insurance, and the obligation to indemnify. Imposing such requirements on the subcontractor indicates an intent to fulfill the ordinary insurance needs of the job by complementary agreements: under the obligation imposed by the first sentence, all employees engaged in the performance of the agreement with Southeast who were under the Workmen's Compensation Law would be covered by the required Workmen's Compensation Policies; and for liability beyond that arising from the project, Izzo was to "carry" a Public Liability Insurance policy insuring both himself and Southeast. Public liability and Workmen's Compensation policies go together. They generally cover mutually exclusive areas of risk.[3] By agreeing to "carry Public Liability Insurance," it must be concluded from the ordinary meaning of such words that Izzo undertook to provide insurance coverage for himself and Southeast against claims for damages to persons or property, American Fidelity & Casualty Co. v. McKee, 198 Ark. 601, 605, 130 S.W.2d 12, 14 (1939)[4]; Cain v. American Policyholders Ins. Co., 120 Conn. 645, 653, 183 A. 403, 407 (1936)[5]; Pennsylvania R. Co. v. J. Jacob Shannon & Co., 363 Pa. 438, 443, 70 A.2d 321, 324 (1950),[6] to which either or both of them might become liable. In the second sentence of the contract in question here, the indemnification agreement was imposed in order to protect Southeast against losses due to Izzo's negligence that might not be paid under the insurance policies due to the insolvency of the insurer or for some other reason.
 
 
 12
 With the close interworking relationship that normally exists between contractor and subcontractors on a building construction project, given the known vagaries of juries to decide liability questions on other than strictly legal grounds, it would be highly unreasonable to construe the intent of the agreement only to cover the limited area of Izzo's liability. Also, the plain language of the contract compels the conclusion that Izzo must obtain such insurance to protect Southeast and not just himself. If Izzo was only required to protect himself, the language of the agreement whereby he undertook "to carry Public Liability Insurance protecting . . . Contractor (Southeast)" would be devoid of any substantial meaning. The obligation to carry Public Liability Insurance protecting Southeast clearly imputes an intent to require Izzo to obtain such an insurance policy in which Southeast is a named insured and to the extent that the instant claim by Hooks is not covered by the Workmen's Compensation policy it falls within the risks that would normally be protected against by the ordinary public liability policy.[7]
 
 
 13
 Izzo, however, was the only insured named in the public liability insurance policy that he took out.[8] On that basis he contends that he satisfied the requirement of the contract. By such construction he would interpret the contract as though it did not contain the words "protecting . . . Contractor (Southeast)" but it did and by the inclusion of such words the parties clearly intended to accomplish some result that would not be brought about without their inclusion. That could only be to furnish a Public Liability policy "protecting . . . (Southeast)." That is the plain meaning to be taken from the undertaking "to carry . . . Insurance . . . protecting . . . Contractor."
 
 
 14
 We therefore agree with the interpretation of section 7 offered by Southeast Construction, and hold that the third party complaint was improperly dismissed. Izzo was required to protect Southeast by purchasing a public liability insurance policy in which Southeast was a named insured or otherwise covered for the risks ordinarily protected against by such policies.[9] We thus vacate the judgment of the district court and remand the case to it for such further proceedings consistent with this opinion as may be necessary.
 
 
 15
 Judgment accordingly.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(d)
 
 
 [1]
 The quoted passage relates to insurance policies, but the same distinctions would be applicable to contracts of indemnity entered into by private parties
 
 
 [2]
 § 1:88. PUBLIC LIABILITY INSURANCE
 The term "public liability insurance" means general liability insurance, or insurance such as protects a person against loss or liability by reason of personal injuries to other than employees.
 (Emphasis added). Whether employees of a subcontractor are covered, however, will depend on the wording of the contract:
 An injury to an employee of a subcontractor is covered where a (public) liability policy covered all operations necessary or incidental to the insured's business.
 7A J. Appleman, Insurance Law and Practice § 4493.3 (1962), citing Chrysler Motors of Calif. v. Royal Indem. Co., 76 Cal.App.2d 785, 174 P.2d 318 (1946).
 
 
 [3]
 Public liability or indemnity insurance protects "against damage to property or for personal injuries to nonemployees, as distinguished from employer's liability insurance . . . " 11 Couch, supra at § 44:246. See note 2 supra
 
 
 [4]
 An insurance policy indemnifying a bus owner against loss from liability imposed on him by law for claims against him for damages to persons accidentally receiving bodily injuries during use of his buses was a policy of "public liability insurance."
 
 
 [5]
 The object and common conception of the scope of public liability insurance is third party insurance coverage against the liability of the assured for injury sustained by a third person due to negligence. 120 Conn. at 651, 183 A. at 406
 
 
 [6]
 This case holds that by contracting to "furnish Public Liability Insurance" the Railroad was required to supply insurance embracing "property damage as well as damage to the person because the term included both elements of damage." 363 Pa. at 443, 70 A.2d at 324
 
 
 [7]
 See notes 3, 5 supra
 
 
 [8]
 And see note 9 infra
 
 
 [9]
 We note that Izzo's "Certificate of Insurance," under the heading "(b) GENERAL LIABILITY," subheading "BODILY INJURY," states that it covers "Contractual " liability; and under the "LIMITS OF LIABILITY" heading, the dollar limits are "$300,000 each person, $500,000 each accident/occurrence." Izzo here was clearly under a "contractual" requirement arising out of the agreement between the parties to cover Southeast for its public liability